Staples, J.
The complainants, who are the appellants here, base their claim to relief upon two distinct grounds, which will be considered in the order in which they are presented.
The first ground applies exclusively to Mrs. Jane ,D. "Winston. Her position is, that Richard M. Winston was her general agent and manager; and as such; obtained control of her funds; that he used her credit and money to the amount of twelve thousand five hundred and fifty dollars and seventy-five cents, in the purchase of the several interests in remainder in the “Poplar Springs estate;” and having taken the deeds in his own name, he held the legal title subject to a resulting trust in her favor, to the extent he had so used her credit and money; and to that extent there is a failure of consideration in the bond which is the subject of controversy.
On the other hand, it is claimed by the defendants, that four of the interests in remainder were purchased by Richard M. Winston, with his own means, or upon his own individual credit. As to the other interests, it is admitted they were paid for with money furnished by Mrs. Jane D. Winston; but it is insisted, the money thus furnished was given to Richard M. Winston byway of advancement. In support of these respective pretensions, the depositions of many witnesses have been taken, including the parties to the controversy. This testimony is conflicting and wholly irreconcilable. As might have been expected, a bitter and protracted family feud is the result. I do not propose to discuss this testimony. Discarding entirely the depositions of the parties, and also the evidence of the witnesses where there *118 is any.confiiet, I shall base my conclusions uj>on admitted or well established facts.
It may be safely assumed, that Mrs. Jane D. Winston, before the sale to her daughter, Miss Sallie P. Winston, was apprised of the contents of Richard M. Winston’s will. She knew he claimed. “ Poplar Spring” estate in remainder, as his property; that he had authorized his executors to sell it; and she knew the terms Upon which the sale was to be made. With this knowledge, she made no objection, when Miss Sallie P. Winston notified the executor of her wish to make the purchase upon the terms proposed. The papers were read over by her, or to her, at her own house, before they were signed and executed by the contracting parties. She knew all the facts; she was perfectly acquainted with the whole arrangement. And yet she never intimated to the executor or to any one else, so far as this record discloses, that “Poplar Spring” belonged to her-in remainder; that it was purchased with her money; and that her son had violated his duty and his contract in taking the deeds to himself. So far from it, she united with her daughter in the bond given for the purchase money; and she saw, without objection or complaint, the deeds executed by the parties, acknowledged and placed on record. Row, supposing that Mrs. Winston did not at the time fully comprehend the nature and bearing of the deeds and the effect of what she had done, she certainly did so afterwards. She had an interview with Mr. James Lyons, for what precise purpose does not appear, and he explained to her the nature of the several papers prepared by him. She tells us, however, she was no better satisfied than before. And yet after this, she insisted upon paying the executor a part of the bond in Confederate currency, not because she desired to rid herself of a burdensome obligation upon *119 the easiest terms, but for the reason, as she states, it was her understanding the debt was contracted with reference to that currency. The interest was also paid her in like currency to the close of the war. After the war was ended, it was paid in United States currency until August 1868. The various payments thus made by. her, amounted to more than three thousand dollai’S. During all the time between the death of R. M. Winston, in 1862, to the filing of this bill in 1869, we do not hear of any claim asserted by Mrs. Winston to the estate in question, or to a resulting trust in her favor. Uo complaint is made, no dissatisfaction expressed, with what had been done.
Against this imposing array of facts and circumstances what have we? A single unguarded statement made by Mrs. Rosalie S. Winston, in her deposition, is relied on to annul the deliberate contracts of the parties evidenced by insti’uments of the most solemn nature, and an acquiescence of seveu years. Upon her examination she stated, it was part of the arrangement that compensation should be made by her husband, Richard M. Winston, to Miss Sallie R. Winston, by paying her an intei'est on an estimated principle beginning at the same age, as such advancements were made to Richard M. Winston, until an equal amount of principal should be given to both. I do not attach the slightest importance to this statement, because it is obvious the witness did not understand the drift of the question asked her, or of the answer she gave. Before the examination was concluded, she fully explained her meaning. In her answer to the bill, she states, with great particularity, her understanding of the whole arrangement, and all the facts connected with it. And it is apparent that she did not intend, as a witness, to contradict the statements made in the answer. Besides all this, the fact supposed *120 to be proved by Mrs. Rosalie S. Winston, is no part of x tbe case made in tbe bill. Tbe plaintiffs’ claim to relief is not based upon any supposed arrangement for the benefit of Miss Sallie P. Winston, but upon the ground there is a resulting trust in favor of Mrs. J. D. Winston, because tbe estate was purchased with her money ’ , r, 1 J ana upon her credit.
It is also insisted, that Mrs. J. D. Winston was, at tbe time of tbe execution of tbe bond and deed, without counsel and ignorant of her rights. But, whose fault is it she was without counsel? She bad ample opportunity of procuring such advice and assistance as she needed. Her friend and adviser, Dr. Price, was present at tbe time, invited there by tbe executor because be occupied that relation. She did not consult- with him; she did not ask for delay. How, if tbe most solemn acts of parties are to be avoided upon averments of this sort, what contracts can ever be enforced ? Plow is such an averment to be answered ? How are tbe courts to define tbe degree of intelligence competent to a valid contract made in tbe absence of counsel and without sufficient information? Ho one, I think, can question Mrs. Winston’s purity of character and integrity of purpose. This record shows that she is a lady of great intelligence and of high social position. But these considerations cannot overcome tbe difficulties in her way. To maintain tbe claim now asserted, she must establish that her own son, in violation of bis duty and bis promises, appropriated her means and money; that be caused deeds to be made to himself for property rightfully her’s; that she was entirely ignorant of bis proceedings for years afterwards, although tbe deeds were executed by members of tbe family and duly placed upon tbe public records of tbe county. She must satisfactorily explain why she expressed no disapproval of tbe purchase made *121 by her daughter; why she united in executing the bond •given for the purchase money; why it was she punetually paid the interest for so long a period without ob- , . . jcction; and why it was, for more than seven years, she not only acquiesced in, but actually admitted the claims asserted by Richard M. Winston and his representatives. # . This record contains no explanation, or even attempted explanation, of these matters.
It is very manifest that Mrs. Winston desired and intended that her son should become the owner of the “ Poplar Springs estate,” after her death. To this end she advanced him the means to purchase the interests in remainder. She was amply able to do so, out of the profits of her estate. She intended also to advance her daughter; and but for the war, she would easily have accomplished that purpose also. The losses she sustained, in common with many others, have prevented the fulfilment of these generous intentions. It is greatly to be deplored; But this change of circumstances cannot convert into a loan that which was simply a gift; nor raise a resulting trust in opposition to the acts and uniform declarations of the parties for a long series of years.
Under all these circumstances, satisfied as I am that the facts do not sustain Mrs. Winston’s claims, I do not deem it necessary to consider the questions of law relating to resulting trusts, so elaborately discussed by the learned counsel.
The second ground of relief applies exclusively to Dr. Thomas L. Gregory. It is insisted that the execution of the fourteen thousand dollar bond, by Miss Sallie P. Winston, pending a treaty of marriage between her and Dr. Gregory, without notice to him, was a fraud upon his marital rights; and such bond is therefore invalid as to him.
*122 There is no question that before the marriage the husband cau have no right to any portion of his wife’s property. She is at liberty to dispose of her fortune in such manner as she pleases, provided it is done with proper motives, and without an intention to deceive her intended" husband. As ivas said by the Master of the Rollsin England v. Downs, 2 Beav. R. 522, 528 : “The equity which arises in cases of this nature depends upon the peculiar circumstances of each case, as bearing upon the question whether the facts proved do or do not amount to sufficient evidence of fraud practised on the husband.”
In the Countess of Strathmore v. Bowes, 1 Ves. jr. 23, Lord Thurlow said: The question which arises upon all the cases, is whether the evidence is sufficient to raise fraud. Sec also the same ease reported in 2 Cond. Eng. Ch. R. 33, where the same principle is affirmed. In this country, as in England, it is universally agreed that the ground upon which such transactions are' invalidated, as against the husband, is the fraud of the wife. Cole v. O’Neill, 3 Mary. Ch. R.; 1 Story’s Eq. 273; Schoule’s Domestic Relations, 269.
In this State the point has never been decided; though the case of Fletcher v. Ashby, 3 Gratt., leads to the conclusion, that in the opinion of. the court the distinct ground of relief in all this class of cases, is the meditated fraud practiced by the wife upon the intended husband. Judge Allen, speaking for the court, places the decision upon the ground “that the evidence in the record did not show that the deed executed by the wife, prior to the marriage, was executed with intent to commit any fraud upon the marital rights of the husband.”
As to what is sufficient evidence of fraud in such cases, the authorities are not agreed. Goddard v. Snow, 1 Russ. R. 485; Loader v. Clarke, 2 Macn. and Gor. 382; *123 1 Lea. Cas. in Eq. 449; St. George v. Wake, 7 Eng. Ch. R. 610. But it is agreed, that although the settlement is voluntary and not disclosed to the intended husband, it is not, therefore, necessarily fraudulent. The courts will consider the nature of the provision, the situation of the husband in point of pecuniary means, and any other facts which tend to show that no fraud was intended. King v. Cotton, 2 P. Wms. 674; Anonymous, 34 Alab. R. 435.
It is also clear that an obligation founded on a valuable consideration, executed pending a treaty for marriage, cannot be set aside merely because it is concealed from the husband. The case of Blanchet v. Foster, 2 Ves. sen. 264, recognizes the distinction between such an obligation and a mere voluntary settlement. There a bond was given by a woman about to marry; and at her request it was concealed by the obligee from the intended husband. It was held, nevertheless, he could not be relieved against it. LordHardwicke said: “If a woman about to many parts with a portion of her property, or gives a security or assignment, they are relievable against in this court; but where a debt is contracted for valuable consideration, though concealed from the husband, it is no fraud on the marriage.” The decision in Crump et als. v. Dudley, 3 Call 439, obviously proceeded on this ground, though the reasons of the court are not given. In these eases the transaction must of course be bona fide. Eor, if the wife meditates a fraud, and the other party is aware of it, the obligation would be void as to the husband. "With this limitation the husband, so soon as the marriage takes place, becomes bound for all the outstanding debts of the wife, dum sola, of whatever amount. She may owe large sums at the time of the marriage, and have nothing to offset them. She may have studiously concealed their existence from her afB. *124 ancej husband. But none of these considerations can avail him. When married, she is married with all her as well as her fortune.
Let ns see how these principles aifect this case. I do deem it necessary to discuss at length the much conft’overhM question, whether the contract for the purchase of “ Poplar Springs,” by Miss Sallie P. Winston, was made on the 16th of January 1863, as claimed by the appellees, or in the month of March thereafter, as asserted by the appellants. I am satisfied, however, that the 16th of January is the true period. The letter of Mr. Lyons, enclosing the papers to be executed by the parties, bears date the 12th of that month. The evidence shows they were within a few days thereafter taken by the executor to the house of Mrs. Winston, and there formally executed. Again, it is conceded by all, that the papers were signed the day of the appraisement of B. M. Winston’s estate. There is no controversy upon that point. We have the receipt of the appraisers, showing the payment made them by the executor for their services; and this receipt bears date the 16th of January 1863. Bow, the appraisers and the executor all agree that the appraisers were paid and the receipt given the same day the appraisement was made. Besides this, we have the receipt of the notary, who was present and took the acknowledgment of the parties, for the fee paid by the executor; and this receipt is also dated 16th of January,1863. The same officer, in his capacity of deputy clerk, gave a receipt for his fee, in admitting the deeds to record; and this receipt corresponds in date with the others. Beither the appraiser, nor the notary, nor the appellants, suggest or even hint at any erasure or alteration of the papers. The original receipts are filed with the record; and there is nothing on the face of them to east-the slightest suspicion upon their correctness. It is *125 impossible to overcome such facts by the testimony of four or five witnesses, speaking solely from recollection. And. I am satisfied the papers were signed, and the tract completely executed, on the 16th of January 1863; and not in March.
And now as to the engagement or treaty for the marriage. Dr. Gregory tells us, he first addressed Miss Winston the latter part of December 1862. She, however, did not give him a definite answer until the Saturday after the 20th of January 1863; at which time the engagement w'as formed. It is clear, then, that there was no treaty of marriage when the purchase was made and the bond executed by Miss Winston. How, it is well settled, that the equity in favor of the husband does not arise, unless it can be clearly made out that at the time of the conveyance of her property by the wife there was an engagement of marriage between them. Kerr on Frauds and Mistake, 219.
It may be conceded, however, that the bond and deeds were executed in March 1863, during the treaty for the marriage. Does the record furnish evidence of any such fraud as invalidates the bond, as to Dr. Gregory; or indeed, of any fraud whatever? It is unnecessary to enter into any extended discussion of the evidence bearing upon this point. A very brief consideration of the facts will dispose of this question.
The will of Diehard M. Winston was admitted to probate early in the spring of 1862. At what period its contents were first made known to Mrs. Winston and her daughter is a matter of controversy. Miss Winston, however, in the summer of that year, stated to a friend she expected to become the owner of “Poplar Springs,” that she had promised her brother Diehard to take it in case of his death. It is very certain, that before the .close of that year, the parties had agreed upon the sale *126 and purchase, and that Mr. James Lyons, as a mutual J friend, should prepare the necessary papers. Mr. Lyons was consulted, and promised to have them ready by the first of January, 1863. The papers were, however, not PreParecf until the 12th, and were antedated by the draughtsman, to correspond with the time first agreed on. blow, whether the contract was executed in January, or whether it was executed in March, it was executed in accordance with an agreement entered into and fully understood by all the parties, before any treaty of marriage, and iudeed before I)r. Gregory had made any declaration of his intentions. Under these circumstances, it would seem impossible that any fraud upon his marital rights could have been meditated. See Waller v. Armistead’s adm’r, 2 Leigh, 11
Again: It appears that the deed of the executor, convoying the property to Miss Winston, and the deed of trust executed by her, were acknowledged before the deputy clerk, and admitted to record on the same day they were executed, or certainly within a few days thereafter. The deed of trust recites the bond, its date and amount, and all the facts and circumstances of the transaction. If, then, the month of March be regarded as the period of entering into the contract, according to the pretensions of the appellants, it appears that the parties, more than a month before the marriage, placed their deeds upon the records of the county; where they were open to the inspection of the intended husband and the entire community. I do not mean to say that this registration is to be regarded as constructive notice to Ur. Gregory. Whether it would have that effect under our statutes, it is unnecessary now to decide. But clearly the promptness displayed in placing the conveyances upon the record, does not indicate any expectation or desire to keep the transaction concealed from the in *127 tended husband. O’Neill v. Cole, 4 Maryl. R. 107. Another circumstance deserves consideration in connection with this question of fraud. It .would seem have been the earnest desire of Mrs. Winston and her children to retain “Poplar Springs” in the family. With this view, Richard M. Winston became the purchaser of all the interests in remainder; his mother assisting him in paying the purchase money. In the event of his death, Richard M. Winston desired that his sister should become the owner; and in his will he offered the estate to her upon substantially the same terms he had purchased it. Miss Winston, with the consent of her mother, accepted the offer. Mrs. Winston’s determination, no doubt, was to advance the daughter to the same extent she had advanced the sou. She expected to pay the interest accruing upon the bond, as indeed she did pay down to August 1868. As to the principal of the debt, that would ultimately belong to her or her daughter; and in this way be extinguished. But if this expectation should not be realized, the estate itself was bound for the debt under the deed of trust, and constituted ample security for its payment. As the parties were then situated, with means and resources they then com manded, these were very reasonable calculations. The contract was such as they might reasonably expect to perform without inconvenience or loss to themselves or others. And I have no idea that either of them, or any of the parties to this family arrangement, over entertained a thought that Dr. Gregory could in any way be injured or affected by the obligation given for the purchase money. It is very clear there is not the slightest ground for the imputation of fraud upon any one connected with the transaction.
The only remaining question to be considered is, whether the bond in controversy was, according to the *128 understanding of the parties, to be discharged in Confederate notes. There is no proof in the record of any ' understanding on the subject. As usual the parties differ in their construction of the contract. We must, there- . fore, look to their conduct and the other circumstances of the case to ascertain the meaning of the obligation they have executed. There is no doubt but that the price agreed to be paid by Miss Winston, estimated in a sound currency, is an extravagant one. It is, however, about the same Richard M. Winston paid the devisees for their interests in remainder. By his will, executed in 1861, he (Richard M. Winston! offered the estate to his sister upon the same terms at which he had jiurehased it. It is very certain he did not mean Confederate currency, as no such currency was in existence when the will was made. Miss Winston, in accepting the offer, must be regarded as doing so upon the terms proposed. The executor was not authorized to suggest or accept any other. Indeed it was no part of the executor’s duty to propose terms; but solely to make them known. He was not negotiating a sale, but consummating one projiosed by his testator.
It is also to be borne in mind, that the principal of the debt was only to be paid at the death of Mrs. Rosalie S. Winston—an uncertain event. It is hardly presumable that the executor would receive, or agree to receive, a sum thus payable and well secured, in a currency subject to a daily depreciation. Rothing in the record gives the least countenance to such an inference or conclusion.
It is true that Mrs. Winston made a tender of five thousand dollars, sometime in the year 1864; which was refused by the executor. The bond was not then due, and there was not the slightest pretence of right in the tender. But after this, and after Mrs. Winston had con- *129 suited counsel on the subject, she continued to pay the v xi/ interest punctually during the war in Confederate currency. And after the close of the war she paid in present currency the interest- for three years upon the whole amount of the bond. These the facts of the case, lead irresistibly to the conclusion that the bond was executed without reference to Confederate currency, and was to be paid in the circulating medium of the country, at the period of its maturity.
For these reasons I am of the opinion there is no error in the decree of the Circuit court, and that the same should be affirmed. In considering the case I have not deemed it important or necessary to pass upon the exceptions to the depositions. These exceptions present novel and difficult questions, only to be decided after a very deliberate consideration, which the court has not been able to give in this ease. My opinion is based upon facts fully established, without reference to the testimony given by the parties. If we should, however, consider that testimony, it would hot change the result. To say the least, it is very conflicting; and being so, the undisputed acts and declarations of Mrs. Jane D. Winston and her daughter, Mrs. Gregory, the instruments executed by them of the most solemn nature, must be regarded as conclusive of the controversy.
Anderson, J. Even if the testimony of Dr. Gregory and his wife, and of Mrs. JaneD. Winston, is excluded, and the ease is to rest upon the testimony of the appellees, I think it is evident that the money which R. M. Winston received from his mother, to purchase the interests in remainder in the “ Poplar Springs” farm, was advanced to him with the understanding that his sister should be equally advanced; and then, and not until ' *130 then, it was to be his absolute property. I think this is shown by the testimony of Mrs. Rosalie S. Winston, ■ the widow of Richard M. Winston, whose interest is directly opposed to this theory; and her testimony should,, therefore, be taken most strongly against her. And there is nothing in her answer, or in the testimony of the other witnesses, in conflict with it.
' She says the first payments were made by R. M. Winston, with, his own money. Afterwards they “were made with the money loaned him by Mrs. Jane D. Winston. It was also a part of the arrangement that compensation should be made to Mrs. Sallie P. Gregory, by paying her an interest on an estimated principal, beginning at the same time—at the same age, I mean—as such advancements were made to her brother, until an equal amount of j)rincipal should be given to both.”
There seems, then, to have been an arrangement or agreement between Mrs. Winston and her son and daughter, as to the terms or conditions upon which she would loan or advance money to her son, to buy up the remainders; and this before he received one dollar of her money for that purpose. And the witness seems to give here, an unvarnished representation of what that arrangement was. It is, in effect, that the mother would loan money to her son for that purpose, upon condition that his sister was-to be made equal, when it was to be his absolutely. And until that could be done, the mother was so intent upon exact equality, that she made it a condition that her daughter, when as old as her brother was when advanced, should receive interest upon the same amount which should be loaned or advanced to Mm.
The money she proposed to allow him to use in the purchase of these shares, was hers, and was not to be his, until his sister was made equal. The annual profits of. *131 the estate was hers also; and the whole was to be bound, to make the daughter equal with her brother. This, I think, is deducible from the answer as given, but is made clearer by her answer to the next question, to wit: “"Who was to make that compensation to Sallie Winston?” The answer is: “My husband, I suppose.” This she immediately qualifies thus: “ The estate was bound for this payment until she was made equal.” What estate? The estate of Mrs. Winston. And this very money, which she proposed to advance to her son, upon the terms that her daughter was to be made equal to him, and which had not yet been advanced to him, was her property, and a part of her estate, and was to be bound and advanced to him on those terms. This is the simple and unvarnished testimony of the witness, when examined in chief, on her own behalf, by her own counsel. And I cannot doubt its truth. And upon it I think the appellant might safely rest his ease. But her counsel, seeing its bearing against her, and the importance of breaking the force of it, after playing off for some time on other subjects, returns to this, and propounds to her the 37th question, which is in these words: • “You state in answer to the 24th chief question, that the first payment he (meaning R. M. Winston) made with his own money; the payments afterwards were made with the money loaned him by Mrs. Jane X). Winston.” State whether the money thus obtained from Mrs. JaneD. Winston was understood to be an advancement to the said R. M. Winston, or merely loaned by her to him, to be repaid by him ?” Tlhs question is objected to by the appellants’ counsel, as leading. It seems to me that it clearly suggests to the witness what answer was desired, and ought strictly to be rejected. But, what is the answer? It is: “As advancements, certainly.” As I view it, it matters not whether it was an advance *132 ment or a loan; it having been made, as testified by this witness, pursuant to an arrangement previously that the daughter was to be made equal. The advancement was to be made upon a stipulation or con-®i°n’ which was for the benefit of Sallie P: 'Winston; and it matters not by whom she was to be made equal; if that was not done, the advancement did not vest in her brother an absolute property. Suppose the arrangement had been in terms thus expressed: “You may take the money with this understanding: that your sister is equally advanced; and that after she attains your age, she is to receive interest upon the same amount you get, until she is made equal;” could that be held to be any thing but a conditional advancement ? And could it change the effect of it, that the daughter was to be made equal out of the estate of her mother? I think not. If for any cause the daughter was not made equal; as,for instance, by the death of the mother, which terminated her estate; or the loss of her estate in her life time, whereby she was unable to make her daughter equal, there would be a failure of the condition upon which the gift was to be absolute. And the money having been given to him for a special purpose, to buy up the interests in remainder in the “ Poplar Springs” farm, the investment would be subject to the same condition. Only to this extent, and in this sense, was it a loan by Mrs. Winston to her son. It is not claimed that it was to be repaid by him, except only so far as it might be necessary to make his sister equal. And whilst this answer of the witness is, that the money which she had reviously described as a loan to her husband from his mother, was an advancement, she does not otherwise negative the alternative branch of the inquiry: “or mei ely loaned by her to him, to be repaid by him ?” The answer can properly be only understood to mean *133 that it was an advancement only in the sense that it was not “a loan to be repaid by him.” Hor is it contended by the appellant, that it was a loan in that sense. I do not , regard-this answer as conflicting in substance withjier answer to the 24th question.
Her counsel then propounded the 38th question, in these words: “You further state, in answer to the 24th question: It was also part of the arrangement that compensation should be made to Miss Sallie P. Gregory, by paying her an interest on an estimated principaland in answer to the 25th question, which is in the. words following, to wit: “’Who was to make that compensation to Salllie P. Winston?” you say: “My husband, I suppose. The estate was bound for this payment until she was made equal.” “ Did you understand, and so intend it to be understood, that E. M. Winston was to pay the said compensation out of his own means, or that the payment was to be made out of the profits of the estate ? Please state fully what you mean by said answer?” This question is also excepted to, upon the ground that it is leading, &c. Considering the relation in interest which the witness stood to the cause, if the question is not illegal, the manner in which it is propounded is calculated to weaken the force of the answer. But if we give it all the credit which the circumstances would warrant, it seems to me that it does not change the effect of her previous unembarrassed testimony. Her answer is: “I answered this question .without thinking on the subject. It is.an absurdity to suppose that Mr. E. M. Winston was bound for the said payments, as his only means were a small salary paid him by his mother, Mrs. Jane D. Winston, for his services rendered on the farm.” She had said, payment was to be made by her husband. I do not think she meant that it was to be paid by him out of his small salary, which she now so *134 triumphantly negatives. But she had immediately qualified what she did say, by adding, “the estate was bound.” I do think she meant that the whole estate was bound for.it; and as her husband had it in his hands, and the management of it, he could make the payments to his sister, to equalize her with him, out of the profits. So that she was not far wrong, when she supposed that the compensation was to be made by her husband, not out of his small salary, which would have been absurd indeed. But to say that the whole estate, including the large sums which were to be advanced by the mother to her son, being part of her estate, should be bound, to make her daughter equal, (which she virtually asseverated in her answer to the 25th question, when she said “ the estate was bound,”) involves no absurdity; and she has not retracted it in this, her explanation, and no where in her deposition.
She answers further: “Mrs. Jane D. Winston received all the profits of the estate; and there is no question or doubtthatshe meantto make advancements to her daughter as she had done to her son.” But at that time, when this agreement or arrangement was made, she had made no advancement to her son; and what she then agreed to advance to him ivas her property, and she had a right to advance it with that limitation or condition. Biit that Mrs. Winston intended to make advancements to her daughter I doubt not is true. But her daughter has received no advancement; nor has she received the interest on the sum which her mother advanced to her brother. We have seen that those advancements were made to him on terms, as testified by his widow. Those terms have not been complied with. His sister is entitled to be equally advanced with him; and until that is done, she is entitled to interest on a sum equal to the amount he received. There is no estate in the posses *135 sion of Mrs. Jane D. Winston, out of which she can be , paid. , The profits of her estate are barely sufficient for her scanty support. As matters are, Richard has reeeived all, and there is nothing left, wherewith to make his sister equal with him. But he received it, with the understanding and agreement that his sister was to be made equal. That can only be done by his paying over to her a part of what he had been over advanced.
It is most manifest, if there is one thing certain in this cause, it is, that it was the fixed purpose and determination of Mrs. Jane I). Winston, that her son and daughter should share equally in her estate.' But it is said, that in her circumstances and condition the amount she gave her son was not an unreasonable advancement, and was not at all inconsistent with that purpose; that she had an estate which yielded an income of five or six thousand dollars annually, and that when she advauced the several sums to her son, amounting in the aggregate to about 12,650 dollars, there was a reasonable certainty that she would be able to make her daughter equal. But is this so? The proof is, that her annual income had been very variable; that it had been as low as 3,000 dollars, and had reached as high as 6,000 dollars in a year. But the estate from which she derived her income was principally a life estate; it terminated with her life. If she lived long enough, and her affairs were as prosperous as they had been, she might be able to advance her daughter equally. But the condition she made, that her daughter was to be paid interest, upon a sum equal to that which she agreed to let her son have, for the special purpose before adverted to, until she was made equal to him, shows not only her purpose of exact equality between them, but also that she herself calculated that it might be many years before she could ad *136 vanee from lier income enough, if at all, even if she lived, to make her daughter equal. Her ability, then, make advances to her daughter, equal to the large advances she contemplated making to her son, was susPen(^e(^ upon the brittle thread of life, and upon its continuanee for many years. What is more uncertain % It was natural, then, when Mrs. Winston determined to make these large .advances, to purchase the interests in remainder in the “Poplar Springs” farm, which she intended for her son, that she would do so on terms which would secure to her daughtei*, in any event, that equality which was her fixed purpose and the wish of her heart; and those terms, though perhaps not fully, are sufficiently disclosed in the testimony of Mrs. Rosalie S. Winston.
I have given her testimony on this point, in detail, and have dwelt upon it, because, in my opinion, the whole case turns upon it. And as I understand it, it harmonizes, in substance, with the testimony of Mrs. Jane H. Winston. She says explicitly, as the remainder-men were disposed to sell, her son bought them out with her money; and that it was distinctly understood between us that my daughter was to be made equal with him in every particular. And she regarded herself as the owner of the remainders, purchased with her money, until her daughter was made equal. On cross examination she says, when her son made up to her daughter the sum which she advanced, then the place was to be his, at her death. It was understood that the land was to be Richard’s, at her death, if he could make an equivalent for Sallie, out of the farm, of the money she advanced for the purchase of the interests in remainder in the land; for, she says, she “ hadn’t it to give her then, unless he could make it out of the farm.” “ It was a sort of family arrangemejit”
*137 But her testimony is excepted to, because she was a . . party to the contract with her son; and he is not living. The ground of exception is predicated of a contract between her and her son, pursuant to which she gave him the use of her money. If so, it was not a general, q ualified, and unconditional advancement: but was made -*■ on terms. Though there was a contract, she was not a party in interest to it; but in the matter was acting both for son and daughter, as the equal protector of their interests ; and they were equally the objects of her bounty. But Mrs. Rosalie S. "Winston, who is as deeply interested in the result of the suit as any one, insists upon excluding her testimony, as well as Dr. Gregory and his wife’s, whilst she gives her own. But if Mrs. Gregory’s testimony is excluded, Bickerton L. Winston’s is inadmissible. I am not prepared to say that Mrs. Jane I). Winston was incompetent. But, let the whole of the appellants’ testimony be excluded, and let the case rest upon the one-sided testimony of Mrs. Rosalie S. Winston and her witnesses, and it seems to me that the evidence still preponderates in favor of the proposition that it was not a general, unqualified advancement to the son, but was made upon terms or conditions, that it was to be his, when his sister was made equal to him Doubtless it was expected that this could be done out of the profits of the estate, if life was spared and they encountered no extraordinary difficulties. But he took the money With the understanding that his sister was to be made equal to him; and as a consequence, if that could not be done from any cause, he would have to refund, and the investments he made would be chargeable.
The testimony of E. T. Winston and Bickerton L. Winston, (if his testimony can be considered,) are not in conflict with the testimony of Mrs. Rosalie S. Winston, as it is plainly to be understood. They both say that *138 Mrs. Jane D. Winston spoke to them of having made advancements to her son. And so she did. But they were made with conditions and limitations, which it was not incumbent on her to have mentioned to them, unless she undertook to disclose to them fully and in detail the arrangement made between her and her son, to which Rosalie S. Winston testifies; but this does not appear.
if or is the testimony, as understood, in conflict with Mrs. Rosalie S. Winston’s answer. She admits in her answer the general agency of R. M. Winston for Mrs. Jane D. Winston, in her business affairs; but denies that he purchased the remainders “acting as her agent, for her‘use and benefit.” This it is not necessary to controvert, to make good my position. But she admits in her deposition, indeed asseverates, all that is necessary to maintain it.
hfor is the conduct of R. M. Winston, in having the deeds for the remainders executed to himself; nor by his will,'disposing of these remainders; nor is the election of Sallie P. Winston, to take his interest in the land, on the terms he proposed; nor the payment by Mrs. Winston, of interest upon the bonds given by her daughter for the consideration of that purchase, repugnant to this view of the case.
I propose briefly to remark on these several assumptions, in. conclusion. The mother expected the deeds for the remainders to be made to her. The son had them executed to himself, I am persuaded, not doubting that the whole arrangement would be carried out, that his sister would be made equal to him; and that as it was the wish and intention of his mother that he should have the land, and his sister should be made equal with money, her purposes would be fully accomplished by having the conveyances made to himself at once. All these transactions, as well as the making of his will by *139 R. M. Winston, were prior to the war between the States, . and. were all done by him with the understanding, mtention and expectation, that the whole arrangement respecting his sister would be carried out to the letter, and that she would be made equal with him. And after the death of Richard M. Winston, in 1862, his mother and . sister, hoping and expecting that the whole arrangement with respect to his sister could and would be carried out, and that she would be made equal to him—without meaning to surrender any part of her right thereto, or to release the estate of R. M. Winston from his obligations thereto—concluded to acquiesce in what the said Richard had done. And Sallie P. Winston agreed to take the interest vested in him iu the laud by the deeds which had been executed to him by the remaindermen, on the terms which the said Richard proposed in his will; and to this end, executed the papers which they were told were necessary and proper. What else could they do ? Mrs. Winston was desirous of retaining the old homestead in her family, which, in the then state of things, could only be done by resisting the will of her son, upon the ground that it was in fraud of his sister’s rights, which she knew was not his design; or to acquiesce in what was done. And unless Sallie accepted his interest in the land, the executor was required to pass it to any one who would take it. And so the homestead would pass out of the family forever. And they could not see that by the execution, of the papers which had been prepared for them, Sallie would be debarred from her right to be made equal, agreeably to the arrangement on which the money had been advanced by her mother to buy out the interests in remainder. They doubtless both confided in the administrator, who was a near relative, and in the lawyer, by whom they were informed the papers were prepared; and executed them, *140 not doubting that it was necessary and proper that they should execute them. I apprehend, however, if they had taken legal advice, they would have required an express stipulation, to the effect that the interests which the representative of R. M. Winston claimed for him. in the land, were subject to the right of Sallie P. Winston to be made equal with him. I am very confident that if they had had the benefit of good legal advice, the papers which they executed are not precisely such as would have been executed by them. But still I do not think that there is any thing in them, either expressed or in effect, which amounts to a surrender on the part of Sallie P. Winston of her right to equality; and to hold the interests purchased by her brother in the land, with his mother’s money, bound to make good that equality, and the interest on the same amount he had received, until she was made equal. She doubtless indulged the hope and expectation, as did her mother, that the arrangement which had been made with Richard M. Winston, upon the faith of which he was allowed to use his mother’s money in buying up the remainders, might be carried out without requiring any part of the money to be refunded, which had been advanced to him with that qualification. But neither the mother, nor her daughter, by agreeing to carry out the will of R. M. Winston, intended that Sallie P. Winston, by the acceptance of his interest in the land, on the terms proposed by his will, should surrender her right to be made equal with him, and to receive interest on the amount which R. M. Winston had received, until she was made equal; and to hold the interests in the land, which he purchased with his mother’s money, bound for it, if it should become necessary.
BTor can I perceive any thing in the act of Mrs. Jane D. Winston, in paying interest on the bond executed by *141 Sallie P. Winston, and herself repugnant to this view of . , the case. That was done in perfect consistency with the purpose and motive attributed to Mrs. Winston and her daughter, in acquiescing in and carrying out the will of R. M. Winston. They then expected that the income from the estate would be sufficient to make Sallie equal and pay interest to her, according to the arrangement, until she was made equal. And as loug as Mrs. Winston had any hope of being able to do it, she paid full interest to her daughter-in-law, upon the price at which Sallie had agreed to take the estate in remainder, and did not allow her daughter to go back on the advances she had made to her son in order to be ■ made equal to him. She paid the whole of the interest during the war, and until 1866. Afterwards she found it utterly impossible to continue to pay the interest and carry out the arrangement as to the daughter, upon the faith of which she had made the advancements to her son; and that her daughter, in order to get the benefit of that arrangement, would have to fall back upon the property in which the money so advanced to her brother had been invested. According to the original design, R. M. Winston -was not required to refund, unless his sister was not otherwise made equal. The money advanced to him, Mrs. J. D. Winston says, was to be his, when his sister was made equal. When she could not be made equal, therefore, he must refund. The-payment of interest by Mrs. Winston, therefore, until it was understood that her daughter could not be made equal without going back upon the advancements to her son, is not at all repugnant. After 1866 she paid a part of the interest; a part being due her after deducting the interest due to Mrs. Gregory.
■ This was a family arrangement; and, the way I view it, is consistent with the amiable, refined and honorable *142 character ascribed by the counsel on both sides to the parties concerned. It is consistent with the filial devo- and paternal affection and honorable character of R. M. Winston. It is consistent with the circumstances -^-rs- ^'t’ue D. Winston; the tenure hy'which she held her estate; and her equal affection for her son and daughter; and her known wish and purpose that they should share equally in her estate; and it substantially reconciles the seeming discrepancies and contradictions of all the witnesses who testified in the cause. On the other hand, it seems to me that the opposing view cannot be taken without discrediting much of the testimony of most respectable and intelligent witnesses, and without giving an effect and operation to the acts of R. M. Winston, his mother and sister, which neither of them ever contemplated or designed, hut which thwarts the intentions and purposes of them all, living and dead, and works the most flagrant injustice to both Mrs. Jane D. Winston and her daughter.
If the view which I have taken of the case could be carried out, Mrs. Gregory would he entitled to receive interest on the one-half of the amount advanced by her mother to his brother, including the price she was to receive for the share in remainder which her father devised to her; and to have the same deducted from the interest accrued and accruing on her bond to the adm’r of her brother. The balance of the interest on the said bond, the widow of her deceased brother is entitled to receive, during her life or widowhood. In this way she would receive a comfortable support; and the arrangement, on the faith of which the money to purchase the interests in the land was advanced to her husband hy his mother, would be carried out.
But, upon the opposing view of the ease, the whole profits of the estate of Mrs. Jane I). Winston, after *143 yielding her a meager support, would fall far short of paying the interest on the bond to the adm’or of R. M. Winston; and according to the terms of the deed > trust, the estate in remainder being liable to be sold for default in payment of interest, will most probably bo sold; and it is likely will be absorbed in the payment of interest. Sallie P. Winston, instead of being made equal to her brother, would get nothing; not only so, would lose the devise made to her by her father; and. her aged mother would be reduced from circumstances of great comfort to indigency, whilst the widow of her son holds a gripe upon them both, which it would cost, perhaps, every stiver worth of property they own to unloose. Such an effect and operation to his acts and his will could never have entered the brain of R. M. Winston. Gould he rise from his grave, to learn that the living of his beloved and venerated mother and his confiding si. ter were spirited away from them, and vested in his widow, by the effect and operation given to his will and the transactions of his life, which he honestly intended should work no injustice, but believed would result in carrying out his beloved mother’s intentions of equal beneficence to himself and his sister, he would be overwhelmed with grief and amazement.
Whilst it is my duty to give effect to the law, I take no pride or pleasure in doing so when it works injustice. I confess it is always my wish, if the case will bear the interpretation, to take a view of it which enables me to do justice in the particular case, whilst I give effect to the law.
The view which I have taken of this case, although not clearly presented by the pleadings, I think is deducible from the averments made therein and the proofs in the cause, and reasonably comports with the conduct and probable intention of the parties, and with *144 the plain and palpable demands of justice, and does no violence to the law of the case. If I doubted, I think Mrs. Jane D. “Winston and her daughter are, in such a case, entitled to the benefit of my doubts.
TJpon the whole, I am constrained to dissent from the opinion of the court.
The other judges concurred in the opinion of Staples, J.
Decree affirmed.